LEON HARDISON, APPELLANT, v. JAMES P. CARMANY, WILLIAM H. BRIARE, JAMES A. BRENNAN, ROBERT N. BROADBENT, DARWIN W. LAMB, JAMES C. RYAN, DAVID B. HENRY AND GEORGE E. FRANKLIN, JR., RESPONDENTS.

No. 6731

December 15, 1972                    504 P.2d 1

*Charles L. Kellar*, of Las Vegas, for Appellant.

*Robert List*, Attorney General, of Carson City; *Roy A. Woofter*, District Attorney, *Richard E. Vogel*, Deputy District

Attorney, and *Thomas R. Severns,* Deputy District Attorney, Clark County, for Respondents.

## OPINION

By the Court, GUNDERSON, J.:

Appealing a judgment denying relief he sought by petition for writ of mandamus, appellant contends the district court erred in not ordering him reinstated as an employee of Clark County Juvenile Services, with pay accruing since his discharge. While appellant proffers several substantial arguments, we need only consider whether his discharge was for "cause," as required by NRS 62.115(1).[1] We hold it was not; we reverse the judgment appealed from; we direct the district court to settle any cost bill appellant may file within 5 days after issuance of our Remittitur, for costs incurred in proceedings below; and we order the district court to issue a peremptory writ of mandamus commanding:

(1) that such costs forthwith be paid to appellant;

(2) that appellant forthwith be fully reinstated to his employment with Clark County Juvenile Services, with all rights accruing since his wrongful discharge;

(3) that except for such monies as may be withheld for

---

[1] NRS 62.115(1) then provided in material part:

". . . Probation officers and employees may be removed, discharged or reduced in position only for cause after having been given the reasons therefor in writing and being afforded an opportunity to be heard before the director of juvenile services in answer thereto."

income taxes, contributions to the retirement fund, and other proper purposes, all wages accruing since appellant's wrongful discharge be forthwith paid to him, together with 7 percent interest from when payments thereof were due;

(4) that appellant be restored as nearly as may be to the situation he would now enjoy had his wrongful discharge not occurred; and

(5) that the Director of Juvenile Services make his return to the district court, within 15 days, setting forth fully what has been done in compliance with said writ.

Thereupon, on notice to all parties, the district court shall expeditiously determine whether said writ has in all respects been obeyed. We further order that in accord with NRS 18.060, appellant will be allowed his costs of this appeal, upon timely filing of a proper cost bill with the clerk of this court, those costs to be paid to appellant at the same time remittance is made for costs incurred in the lower court.

Because appellant Hardison has been exposed to public odium, we will state at length the facts on which this decision rests.

## The Facts

Hardison served some eight years in the juvenile service, ultimately becoming a senior supervisor in the detention facility. While the record on appeal contains no copies of his performance ratings, it indicates they all were favorable.

A few months before appellant's discharge, William C. Power was named an Associate Director of Juvenile Services, thus becoming Hardison's superior. For years, personnel on evening duty at the juvenile detention facility passed spare time playing basketball, ping pong, pool, and cards, all with the administration's knowledge and acquiescence. (Indeed, Clark County Juvenile Services owned the cards thus used.) At the hearing conducted to determine if there was "cause" for Hardison's discharge, cross-examination established Power knew this, but had never notified employees of any policy change.[2]

Following supper on October 20, 1969, detention personnel confined 26 detainees in their rooms to await the evening recreational period; they allowed seven, considered minimum

---

[2]Power testified:

"Q All right, you had never issued any bulletin or memorandum or notice on the bulletin board or directive instructing the staff not to play cards?

"A No.

"Q All right, had you known any one to be issued by Mr. Carmany [the Director of Juvenile Services]?

"A No."

security risks, to remain out of their rooms on work detail within the facility. Three male supervisors (one off duty) began a card game at a desk in the middle of the facility's central rotunda, from which corridors fan out like spokes of a wheel. One Dallmeier, with whom Power had discussed Hardison earlier in the day, was moving about the facility, making periodic visits to see the "Booking officer" who was waiting to alert Power when Hardison returned from work in another building and entered the game. When Hardison commenced playing, Power was notified; he arrived about 6:45 p.m., ordered Hardison to his office, and relieved him of duty.[3]

The first to testify at the cause hearing subsequently held,

---

[3]This is Power's version of how he entered and relieved Hardison and other supervisors of duty:

"On October 20th, I entered the detention area here at Zenoff Hall and noticed the four mentioned supervisors, mentioned in my memo, Leon Hardison, Sam Jermson, Jerry Carpenter, and Mike Akers, sitting at a desk in the rotunda area engaged in a game of cards.

"Also, in the rotunda area itself, there were several subject minors, detainees. I don't remember the exact number, but there was seven or eight, also another supervisor was also present who was dressing down a detainee for recent admittance. He was not involved in the card playing. I approached the group and as I did I noticed cards displayed on the table in front of each person. I asked the group, as a whole, what was going on and they responded that they were playing cards, so at that time I asked Mr. Hardison to leave the rotunda area so that I could talk to him, he being the senior supervisor on duty in charge of the shift. So we went off the floor and I engaged in a discussion, a brief discussion, maybe 15 minutes worth. And at that point I relieved him of his duties and asked him to come back the next afternoon.

"We went back on the floor and asked the other three supervisors, Akers, Carpenter and Jermson to come into my office after which I explained to them the same thing, that they were relieved and I sent them home and asked them to come back the next day at 3:00. I told all four of them that evening that I would think the matter over and have a written recommendation at that time for Mr. Carmany for some disciplinary action and it would be ready by the next afternoon.

"After they left, after they had punched out and left, I went back on the floor to help the remaining supervisors, help control the groups. They called two supervisors that were off and asked them to come in and when I went back on the floor, one of the detainees [name not material] came up to me and told me that two or three kids had escaped out the back door through the kitchen and we immediately had a head count and we were missing three kids.

"I then went back to the Booking Office to tell the Booking personnel to call the police and the other people that were supposed to be called during an escape and at that time Mr. Hardison and Jermson had apprehended one of the kids that had escaped, they found him sitting on the roof as they were leaving the parking area and they left the kid in the Booking Office and we took him back in and they went on.

"The other two off supervisors that were called in came in and then I went home, shortly after that."

Power claimed not to know who called him. However, Dallmeier, who testified later, admitted on cross-examination that "the Booking officer told me that they wanted to inform Power that the game was going on, but refused to do so because Hardison was not there. He was over at Child Haven." Dallmeier said the Booking officer, Geneva Moore, told him she "had spoken to Power and that Power needed some specific incident to take action on that." After Power arrived, Geneva Moore told Dallmeier she had called Power. These and other facts establish that Power was proceeding under a preconceived plan to obtain cause for Hardison's discharge, and that Power attempted to conceal this in his testimony.

According to Power, shortly after he first relieved Hardison, and then the other card-playing supervisors, one of the detainees told him three members of the work detail had escaped. (See footnote 3, supra.) It appears the administration (not Hardison) had previously employed an ex-convict as a maintenance man, without ascertaining his extensive criminal background. Believing this man had supplied detainees with keys used in prior escapes, the administration had therefore ordered all locks changed.[4] The evening in question, the locksmith had arrived, let himself into the facility's kitchen, removed cylinders from the lock on the kitchen's outside door, and had taken them to his truck to change the pins. The three detainees had grasped this opportunity to escape. Thus, although Power attempted to relate Hardison's termination to this escape, the truth is Power had formulated his plan before the escape, for which Hardison cannot be blamed in any event.

If the record fixes responsibility for the escape on anyone, that person is Power. Hardison testified seven detainees were on work detail, and all were present when he was ordered to Power's office.[5] Regarding the number of inmates on work detail when he arrived, Power said: "I don't remember the exact number, but there was seven or eight"; he admitted he

---

[4]Power testified that "it was speculated . . . that Sam Cooper had stolen or been given a set of keys," and that Power therefore talked to the Director of Juvenile Services who "wanted to change all the locks, so it was done. The locks on all of the buildings were changed."

[5]Hardison testified:

"Q   And do you have a distinct recollection of having seen them also at the time when Power came in and instructed you to break up the game and come to his office?

"A   Yes, I did.

"Q   So that is your belief and your testimony, that they were still there at that time?

"A   Yes."

then saw the detainees who later escaped. There is no dispute whatever about this fact.[6] Thus, assuming as Power suggested that he could charge Hardison with "ultimate responsibility" for everything that might occur when Hardison was on duty, vicarious responsibility cannot plausibly be imputed for an escape occurring after Power ordered Hardison away from his duties.[7]

The following day, Power succeeded in obtaining a letter of resignation from Hardison. Hardison shortly thereafter learned he could not be compelled to resign without a hearing, requested the letter's return, demanded a hearing and, this being refused, filed his first petition for a writ of mandamus. Thereupon, the district court ordered the Director of Juvenile Services to conduct the hearing NRS 62.115(1) required.

By then, Power had developed several justifications for Hardison's termination, in addition to the fact he had been playing cards.[8] Although none had substance, the Director of

[6]Toward the conclusion of the "cause" hearing, we find the following colloquy between Hardison's counsel and Mr. Carmany, the Director of Juvenile Services, who acted as hearing officer:

"Mr. KELLAR: Okay. It certainly has also been the testimony that both by Powers and Hardison and Jermson that the seven boys were up in the rotunda area when Powers came in.

"They weren't in the kitchen or in the bathroom or in the—shut up in their rooms. They were in the rotunda area where this card game was going on.

"Mr. CARMANY: Yes, this is their testimony."

[7]Apparently unconcerned about the work detail, Power first relieved Hardison, then ordered three other supervisors to his office and relieved them also. Of course, the staff thus decimated, the work detail was unsupervised unless Dallmeier was present, a fact unclear in the record. Apparently to negate the possibility he thus caused the escape himself, Power testified the detainee who reported it said it "happened approximately a half hour or 45 minutes before the time he told me, which was about a quarter after 7:00, so it [the escape] would be 6:30 or a quarter to 7:00." If one credits this calculation based on hearsay, fixing the escape when only Hardison was relieved of duty, perhaps one cannot blame Power directly for the escape. Still, judging Power as he would have Hardison judged, one might say that after Power took control of Hardison's shift, he had the "ultimate responsibility."

In any event, Power made no real effort to determine when or why the escape occurred; he simply later proclaimed it another justification for seeking Hardison's discharge.

[8]The following are Power's principal afterthoughts, by which he sought to justify Hardison's dismissal:

Power advocated that Hardison should be held responsible for the escape. This cannot be done; Hardison had been ordered to Power's office before the escape, which may well have been precipitated by Power's acts, rather than by any prior act of Hardison.

Power testified that about August 27, 1969, he had "reprimanded"

Juvenile Services upheld his discharge. Hardison again petitioned the district court for a writ of mandamus, seeking reinstatement with back pay. The district court denied relief, except to order back pay from Hardison's original ouster to July 6, 1970, when the Director had ultimately confirmed his discharge after the aforementioned hearing. Hence, this appeal.[9]

## The Applicable Law

Under NRS 62.115(1), Hardison could properly be discharged only for "cause." Interpreting Reno's City Charter, which authorized the chief of police to suspend a police officer for "cause," this court heretofore endorsed this definition:

" 'Cause' or 'sufficient cause' means legal cause, and not any cause which the officer authorized to make such removal may deem sufficient. It is implied that an officer cannot be removed at the mere will of the official vested with the power of removal, or without any cause. The cause must be one which specifically relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public. The cause must be one touching the qualifications of the officer or his performance of his duties, showing that he is not a fit or proper person to hold the office. An attempt to remove an officer for any cause not affecting his competency or fitness

---

all senior supervisors, including Hardison, because inmate clothing forms had been incorrectly filled out by personnel unknown. However, Power admitted on cross-examination that he did so because the Director of Juvenile Services had reprimanded Power; he acknowledged he did not know if any of the mistakes had even occurred on Hardison's shift; and when Power was asked to produce a copy of the reprimand, he said his file was "missing."

Power testified that on September 29, he had "reprimanded" Hardison because of a prior escape. However, cross-examination established he had no personal knowledge of the incident, and had no information that Hardison had been specifically in charge of the detainee when the escape occurred. Apparently, Power had reprimanded Hardison because he had been on shift.

Power testified that about September 29, he "reprimanded" Hardison for allowing a detainee to "deface" the facility. Again, Power had no knowledge of how the incident occurred. Again, Power's copy of the reprimand was "missing."

[9]Respondents filed neither notice of appeal nor supersedeas bond; they do not question that Hardison is at least entitled to the back pay the district court ordered; however, they apparently have failed to tender even that amount to him. It is for this reason that we are explicitly directing the district court to ascertain that the writ issued pursuant to our decision is in all respects obeyed.

would be an excess of power and equivalent to an arbitrary removal." Ex rel. Whalen v. Welliver, 60 Nev. 154, 158, 104 P.2d 188, 190–191 (1940).

In the *Whalen* case, we granted mandamus relief, commanding reinstatement of wrongfully discharged police officers. In the instant case, we must do the same.

The record establishes that, either without reason or for reasons that do not appear of record, Power laid plans to generate a reason for Hardison's discharge. That Power was then without legal cause to justify his desire to end Hardison's employment seems apparent from his evident need to proceed in this way, and from the fact that later attempts to bolster that pretext proved insubstantial.

Power's attempt to generate cause is unjustifiable. Such a ploy is meaningless to show an employee "is not a fit or proper person to hold the office." 60 Nev. at 158. Clearly, Hardison was not removed because of some proven dereliction "of a substantial nature directly affecting the rights and interests of the public," but simply on Power's "mere will." 60 Nev. at 158.

As no legal cause was shown for his discharge, Hardison must be reinstated with all accrued back pay and rights, except rights to vacation time off he would have accumulated if he had been allowed to work rather than involuntarily idled. Such time off, of course, he has received. Hardison is also entitled to interest on monies due him, NRS 99.040(5), his costs in proceedings below, NRS 18.020(4), and his costs on appeal, NRS 18.060(2).

This cause is reversed, with the instructions earlier set forth.[10]

Zenoff, C. J., and Thompson, J., concur.

---

[10]Justice Batjer's concurring opinion mentions that, in the hearing before Carmany, exhibits were admitted, which the district court may later have viewed, but which are not part of the record on appeal. For several reasons, such exhibits do not appear critical to fair disposition of the issues, as presented by the parties. Respondents' counsel has not attempted to vindicate the district court's action by reference to such exhibits, and has not suggested that any thing material is missing from the record on appeal. Moreover, the record before us reflects that the district court ordered its clerk to transmit the original record to us and, in the absence of any suggestion that something material is missing, we

BATJER, J., concurring in the result but for a different reason:

Certain exhibits filed in the hearing before James Carmany, director of juvenile services in Clark County, Nevada, have not been filed with this court. The record does not reveal whether or not those exhibits were before the district court. Whether those exhibits would have been sufficiently persuasive to justify this court in reaching a different result is speculative.

I agree that upon the record before us there is insufficient evidence to support the district court's finding that "cause" existed for the appellant's termination.

Nevertheless, I would reverse the order of the district court because the appellant was denied a hearing before a disinterested and impartial hearing officer as guaranteed by the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 8, of the Constitution of the State of Nevada.

It was Carmany, as director of juvenile services, who discharged the appellant, and was then called upon, pursuant to NRS 62.115(1)[1] and an order of the district court, to conduct a hearing and sit in judgment of his original order. This procedure was not only unfair to the appellant but it was also unfair to any director of juvenile services.

In reaching this decision I am aware of Hampton v. Wartman, 85 Nev. 408, 455 P.2d 921 (1969), where the juvenile judge of the district court approved a recommendation of the probation committee that Hampton be demoted. Hampton inappropriately sought a hearing before county officials, then he requested a hearing before a district court judge other than the juvenile judge. The juvenile judge refused to disqualify himself and Hampton sought a writ of certiorari or in the alternative a writ of prohibition in this court. There the juvenile judge afforded Hampton an opportunity for a hearing before him and Hampton did not avail himself of that opportunity. That case is distinguished from this one because the juvenile judge approved the recommendation of the probation committee but here Carmany personally discharged the appellant

---

presume the clerk transmitted to us the entire record on which the district court acted. Furthermore, from review of the record before us, we feel able to discern the tenor of the aforementioned exhibits, and we are satisfied they could not have justified the district court's action, if indeed that court viewed them.

[1]NRS 62.115(1) (In pertinent part): ". . . Probation officers and employees may be removed only for cause after having been given the reasons therefor in writing and being afforded an opportunity to be heard before the director of juvenile services in answer thereto."

before the hearing. Furthermore, the hearing in this case was demanded and held.

After we decided Hampton v. Wartman, supra, the United States Supreme Court decided the cases of Coolidge v. New Hampshire, 403 U.S. 443 (1970), and Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80 (1972), which cast a shadow upon the validity of our pronouncement in Hampton v. Wartman that, "Petitioner's [Hampton's] January 17, 1969 request that the juvenile judge disqualify himself was improper."

In Coolidge v. New Hampshire, supra, a fourteen year old girl was found murdered and Coolidge was apprehended, tried and convicted of her murder. In that case arrest and search warrants were issued by the state attorney general acting as justice of the peace. Prior to issuing the warrants the attorney general had personally taken charge of all police activity relating to the murder and he later served as chief prosecutor at Coolidge's trial. In reversing and remanding the case the High Court found that the warrant authorizing the search of the automobile was invalid on the ground that it was not issued by a neutral and detached magistrate and that seizure and subsequent search of the Coolidge automobile did not constitutionally rest upon such a warrant. In Ward v. Monroeville, supra, the High Court held that Ward had been denied a trial before a disinterested and impartial judicial officer as guaranteed by the Due Process Clause of the Fourteenth Amendment where he was compelled to stand trial for traffic offenses before the mayor who was responsible for village finances and whose court through fines, forfeitures, costs and fees provided a substantial portion of village funds.

Although those cases decided by the High Court dealt with criminal proceedings, I believe the same standard for a disinterested and impartial hearing officer is required in a hearing in a civil case where an attempt is being made to discharge an employee with tenure.[2]

---

[2]In 1971 the legislature apparently recognized the inherent inequities and repealed the provision for a hearing before the director of juvenile services and added NRS 62.117.

NRS 62.117: "In each judicial district which includes a county having a population of 200,000 or more, as determined by the last preceding national census of the Bureau of the Census of the United States Department of Commerce, any probation officer or employee of the probation department, any detention home or other commitment facility administered or financed by the county, appointed under the provisions of NRS 62.115, who has been employed in such capacity for 12 months or more and is dismissed from such employment may:

"1. Within 15 days of his dismissal, request a written statement

MOWBRAY, J., concurring in part with BATJER, J., and dissenting in part:

I agree with MR. JUSTICE BATJER's position that the appellant Hardison was entitled to a hearing before a disinterested person under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 8, of the Constitution of the State of Nevada. The Legislature has now provided for such a hearing. NRS 62.117.[1] I would therefore remand the case to the lower court with instructions that the appellant be granted a hearing before the Clark County Probation committee, in accordance with the procedural provisions of the statute.

"2.   Within 30 days after receipt of such written statement, request, in writing, a public hearing before the probation committee. The probation committee shall adopt rules for the conduct of such hearing.

"3.   Appeal the decision of the probation committee to the board or boards of county commissioners."

[1]NRS 62.117: "In each judicial district which includes a county having a population of 200,000 or more, as determined by the last preceding national census of the Bureau of the Census of the United States Department of Commerce, any probation officer or employee of the probation department, any detention home or other commitment facility administered or financed by the county, appointed under the provisions of NRS 62.115, who has been employed in such capacity for 12 months or more and is dismissed from such employment may:

"1.   Within 15 days of his dismissal, request a written statement from the director of juvenile services specifically setting forth the reasons for such dismissal; and within 15 days of the date of such request he shall be furnished such a written statement.

"2.   Within 30 days after receipt of such written statement request, in writing, a public hearing before the probation committee. The probation committee shall adopt rules for the conduct of such hearing.

"3.   Appeal the decision of the probation committee to the board or boards of county commissioners."